# EXHIBIT B

PROPUBLICA

Donate




ILLUSTRATION BY MATT ROTA FOR PROPUBLICA. ANIMATION BY HENRIKE LENDOWSKI FOR PROPUBLICA.

# Inside Trump's Failed Hunt for Noncitizen Voters

by Peter Elkind, Jen Fifield, Doug Bock Clark, Ken B. Morales and Andy Mannix

August 14, 2026, 6:00 am

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

*Join our reporting team on Tuesday, Oct. 27, for a virtual discussion on how the Trump administration has dismantled guardrails meant to protect the vote and what it all means for the midterm elections. RSVP here.*

## Reporting Highlights

- **Inflated Claims:** HSI deployed its tech platform to find noncitizens on voter rolls, despite warnings from agency insiders that it would lead to an "ungodly" number of false positives.

PROPUBLICA Donate

- **Scant Results:** Despite intense White House pressure, the effort has produced only a few dozen noncitizen voter prosecutions nationwide — and even fewer convictions.

These highlights were written by the reporters and editors who worked on this story.

It was late March when Joe Teirab, the second-in-command at Minnesota's U.S. attorney's office, received an urgent email from Washington.

The federal government was scrambling to find criminal cases to back up President Donald Trump's claims that illegal voting by noncitizens was tipping the scales in American elections. Agents from Homeland Security Investigations, a massive federal law enforcement agency, had been dispatched to work leads across the country, including hundreds in Minnesota.

Teirab was already under pressure. In an earlier missive, Nick Davis, a high-ranking Justice Department appointee helping to lead the election fraud crusade, had reminded him the cases were so high priority that Teirab and his staff couldn't decline to move forward on them without express approval from agency higher-ups. On March 24, Davis demanded a status report — within hours.

Teirab, a former Marine and a Harvard Law graduate who'd run unsuccessfully for Congress as a Republican, responded with a blunt reality check.

"Bottom line up front," he replied in an email reviewed by ProPublica. After subpoenaing records on about 130 people, only one had been referred for prosecution, his staff had told him. Agents had deluged local election offices with calls and demands for voting histories, demonstrating "a complete lack of understanding" of illegal voting investigations.

"The HSI task force has been disjointed and disorganized," Teirab wrote. The entire process, he said, had been "dysfunctional."

Since Trump regained the White House, his administration has launched a series of unprecedented initiatives to find and prosecute voting by noncitizens, which he's long claimed, without evidence, is rampant.

He's stepped up this push in recent weeks, saying in a nationally televised speech that the American election system was "so vulnerable that no one can possibly defend it." To support

Democrats. The documents included no explanation of how that number was calculated.

It's well known the administration has tasked HSI — a force established to combat drug cartels, terrorism and other cross-border criminal enterprises — with leading the campaign to find election fraud cases in the United States.

But an investigation by ProPublica reveals for the first time how the Trump administration came to harness HSI's personnel, technology and sweeping legal authority in service of its election agenda — and how meager the results have been, despite the prodigious resources sunk into the effort.

According to interviews and internal emails reviewed by ProPublica, career staffers at the Justice Department warned that transferring voter rolls to HSI to enable it to search for noncitizen voters could violate federal privacy laws. Similarly, longtime HSI insiders cautioned that using the agency's databases and tools to search these lists would yield mismatches and wildly inflated results.

The administration plowed forward anyway.

---

We are continuing our reporting on how the Trump administration has enlisted HSI agents and technology in unprecedented ways to enforce immigration laws and to bring cases against suspected noncitizen voters. Do you work at HSI and have information you can share with us? You can reach our tip line on Signal at 917-512-0201, or you can contact Peter Elkind at peter.elkind@propublica.org or on Signal at 817-691-3110. Please be as specific, detailed and clear as you can.

---

HSI's involvement in the hunt for election fraud traces at least to summer 2025, when agency supervisors embraced a proposal from a midlevel agent who'd publicly echoed Trump's claims about elections. He argued the agency's powerful databases and tools could find noncitizens even on the voter lists that states make publicly available, from which the most confidential information has been redacted. Under Trump, the Justice Department had collected many public voter rolls as part of a controversial effort to compel states to turn over the unredacted versions.

Those searches went forward, ProPublica's reporting shows, helping to generate tens of

PROPUBLICA

Donate

Between January 2025 and May 2026, a ProPublica analysis of Justice Department data shows, fewer than 150 alleged noncitizen voters were referred for prosecution. Even fewer — 41 — were charged with voting illegally or other election-related crimes. (More than 150 million people voted in the most recent presidential election.)

In response to questions from ProPublica, administration officials insisted the effort spearheaded by HSI was producing meaningful results.

"President Trump is committed to ensuring that Americans have full confidence in the administration of elections, and that includes totally accurate and up-to-date voter rolls free of errors and unlawfully registered non-citizen voters," Abigail Jackson, a White House spokesperson, said in response to ProPublica's request for comment. "Noncitizens voting is a crime. Anyone breaking the law will be held accountable."

A DHS spokesperson didn't answer questions about why so few prosecutions have resulted from HSI's work. The agency wouldn't specify what tools or techniques HSI had used, but confirmed it had cross-referenced "publicly available data" from state voter rolls with information on "known illegal aliens" in its systems. "It's not rocket science," the spokesperson wrote of this initiative in a response to ProPublica's questions. "It's an easy step to secure our elections."

Teirab and the U.S. attorney's office in Minnesota declined to comment.

There's an array of reasons why Trump's campaign to document claims of widespread voter fraud hasn't succeeded. Most obviously, it's exceedingly rare, as countless studies and state audits have found. Noncitizens often get on voter rolls by accident or when government officials make errors. Last month, New Jersey disclosed that a mistake involving its Motor Vehicle Commission caused 6,600 noncitizens to be registered (fewer than 400 voted).

The administration's critics say its hunt for noncitizen voters aligns with Trump's attempts to seek more federal control over elections while stoking doubt and fear about the voting process. Since taking back the Oval Office, Trump has tried to impose new restrictions on voter registration, mail-in ballots and voting machines, though judges have shut down most of these efforts.

Former officials at DHS and the Justice Department called the move to involve HSI a further

PROPUBLICA

Donate

"It's one thing if you're going after Pablo Escobar," said Steve Bunnell, a former DHS general counsel and senior intelligence adviser who handled voting fraud prosecutions during more than a decade at the Justice Department. "It's another thing if you're going after some cleaning lady who's been working in the United States for 20 years and taking care of her 80-year-old mother and taking her little kids to church."



PROPUBLICA Donate

## “The Swiss Army Knife of Federal Law Enforcement”

Trump’s enlistment of HSI in his election fight is no accident. Cobbled together in the aftermath of 9/11, the agency has 7,100 armed, highly trained agents and another 800 criminal analysts, as well as access to troves of confidential data about hundreds of millions of Americans.

Though part of Immigration and Customs Enforcement, the agency has historically stayed out of immigration cases. During the first Trump administration, leaders of 19 HSI regional offices — virtually its entire top field hierarchy — signed a letter calling for HSI to become a standalone agency, arguing that ICE’s deportation work dissuaded people from cooperating with its investigations. But when Trump returned to the White House, it swiftly became clear that the agency would play a central role in investigations related to the president’s twin obsessions, illegal immigration and noncitizen voting.

Trump picked his field general for repurposing HSI even before taking the oath of office. In December 2024, he named Anthony Salisbury, a 50-year-old career agent who’d run the agency’s Miami office, as a deputy homeland security adviser, reporting to White House policy chief Stephen Miller. He was also given a dual appointment as head of HSI.

Salisbury was colorful: A mixed martial arts enthusiast, he once appeared at the agency’s headquarters with his face bruised and eye blackened from a recent bout. He’d sometimes entertain colleagues by pulling out a bridge that covers his missing front teeth.

To agency veterans, however, he was forever linked to a 2011 operation he’d overseen in Mexico in which one agent was killed and another wounded in a highway ambush by a drug cartel. An agency review submitted to Trump in April 2020 concluded that errors by HSI supervisors, including Salisbury, contributed to the outcome; it urged the administration to consider disciplinary action. None was taken against Salisbury, however.

Salisbury did not respond to requests for comment from ProPublica. A White House official called him “a critical member of the Trump administration” who was “cleared” in every review of the Mexico incident and was subsequently “promoted six times under multiple administrations.”

PROPUBLICA Donate

**another thing if you're going after some cleaning lady who's been working in the United States for 20 years and taking care of her 80-year-old mother and taking her little kids to church."**

— Steve Bunnell, a former DHS general counsel and senior intelligence adviser

---

Once elevated to his new posts, Salisbury took charge of carrying out the second Trump administration's agenda for HSI, personally issuing staffing directives, reassignments and promotions, current and former agency officials told ProPublica. (A number of them spoke on condition of anonymity out of fear of retribution.)

Starting in early 2025, Salisbury oversaw the unprecedented reassignment of more than 6,000 agents to immigration enforcement, diverting most of the agency from its normal duties. He then also pointed HSI at noncitizen voting, presiding over multiple meetings with officials at DOJ and Homeland Security focused on election fraud, according to emails reviewed by ProPublica and agency supervisors who worked with him.

"Stephen Miller has an HSI deputy for a reason," said Eric Balliet, a high-level HSI manager who retired in 2024 after 23 years with the agency. (Like many HSI veterans, Balliet has remained in close contact with former colleagues.) "Salisbury is going to salute and execute, and he is going to make sure that from the HSI side, they fall in line, and there's going to be no resistance or pushback. HSI has been turned into the Swiss Army knife of federal law enforcement."

In early July 2025, Frank Quiñones, an HSI special agent who'd worked under Salisbury in Florida, approached leaders at the HSI Innovation Lab with an idea for using the agency's technology to find noncitizen voters on state voter rolls, sources at the agency told ProPublica. Quiñones had been transferred to Washington to oversee a unit that had previously handled cases involving the theft of government benefits but that had been enlisted into voting investigations.

The lab, housed in an unmarked office in a D.C. suburb, had access to the government's most sensitive databases, from suspicious activity reports to arrest records. Staffed by a combination

Quiñones was a true believer in Trump's claims about election fraud: In multiple Facebook posts and reposts, ProPublica found, he promoted claims that the 2020 presidential vote had been stolen. At a meeting with the Innovation Lab's overseers, according to sources who worked in the lab, he pitched using the lab's technology to identify illegal voters — even though the agency lacked voter rolls that included identifiers such as partial Social Security numbers. (Quiñones did not respond to ProPublica requests for comment.)

For proof of concept, Quiñones proposed using a February 2021 public voter list he'd obtained for New Jersey and running it through HSI's databases. The lab staff viewed his idea as "a little insane," one recalled — both unreliable and improper. Since the public rolls don't include voters' unique identifiers, people at the lab also knew linking them to HSI's data would produce mismatches — what the staffer called an "ungodly" number of false positives. The lab team also worried about violating longstanding safeguards limiting use of private citizen data. They "didn't want to touch this," the staffer added. Quiñones defended his idea, repeatedly declaring: "The president wants this!"

Tom Hodge, an HSI data analyst at the meeting, proposed running the voter information through the Athena Toolbox, an analytical platform developed by the Sandia National Laboratories that had access to all of HSI's databases. (Hodge did not respond to ProPublica requests for comment. Sandia referred ProPublica's questions to the facilities' parent agencies, including the Department of Energy, which did not respond to our requests.)

Hodge and the Sandia team spent the next six weeks on the project, reporting they'd found large numbers of noncitizens on Quiñones' 2021 New Jersey list. According to one former HSI official, they said they'd found "5,000 high-confidence illegal voters" in just a single New Jersey county. (Officials at the New Jersey secretary of state's office, which oversees the state's voter rolls, declined to comment on the claim. Beth Thompson, head of a group for local New Jersey election officials, called the number impossibly high, even accounting for the mistake disclosed by the state.)

The apparent breakthrough couldn't have come at a better time.

The Trump administration's other efforts to identify noncitizens on state voter rolls were running into a variety of roadblocks.

Most states also refused the Justice Department's demands to turn over their unredacted voter rolls, including partial Social Security numbers, which thwarted the agency's plan to run them through SAVE. Courts have stymied the DOJ's attempts to sue for the records, citing the Constitution, which gives primary control over elections to the states.

In an Aug. 21 email to a half dozen administration officials, Quiñones touted the solution he'd brought to the HSI Innovation Lab: using HSI's platform to search voter rolls. The results, Quiñones noted, could fuel both criminal and immigration investigations.

By the end of the month, those in top election-related roles at DHS and the Justice Department were actively promoting what they dubbed the "HSI Tool" as a preferred alternative to SAVE, according to people familiar with the matter. Among them was Heather Honey, the prominent election denier appointed as a senior counselor at DHS, who is helping lead the government's efforts to identify noncitizens on voter rolls. (Honey did not respond to ProPublica's requests for comment. In an email responding to questions to her, DHS said Honey's "expertise in election administration" was "invaluable to the Department's efforts to protect critical infrastructure.")

The White House, too, got behind the idea. In a November email, J. Brian Sikma, special assistant to the president, excitedly noted that the New Jersey trial cross-checking voter rolls with DHS data appeared to have identified a "very significant number" of "potential non-citizens." (Sikma didn't respond to a request for comment.)

The DOJ, Sikma reported, had already obtained public voter rolls for many other states. He included a list of them, adding: "It is of paramount importance that these also be reviewed expeditiously."



PROPUBLICA Donate



MATT ROTA FOR PROPUBLICA

## Running "Roughshod" Over Privacy

As the push to use HSI's tech to search voter information gained momentum, a new problem emerged.

Career attorneys at the Justice Department, including specialists on privacy law, raised concerns that transferring voter rolls wholesale from the agency to DHS might not be legal, according to internal emails reviewed by ProPublica and interviews with several former officials.

The voter rolls the DOJ had collected contained sensitive information on millions of Americans. Even the public versions, which political parties and candidates routinely obtain to target ads and messages, included voters' addresses, birth dates and party affiliations. For the 16 states that have agreed to share their unredacted voter lists, the DOJ had citizens' partial Social Security numbers or driver's license information, too.

Federal laws, particularly the Privacy Act, dictate what data government agencies can collect, what it can be used for, how it can be shared, and how it must be protected. Agencies have to disclose their plans in advance, gathering public comment. A person's information can't be released or shared without their consent, subject to limited exceptions.

From the outset, the Trump administration's effort to combine data across federal agencies has repeatedly drawn criticism from courts and whistleblowers for failing to adhere to restrictions meant to keep data private and secure. In June, for example, a judge prohibited the government from using SAVE for mass searches, ruling the administration had violated federal privacy laws by giving DHS access to Social Security data to enhance the tool. The administration has appealed that ruling.

supervisors, according to two former DOJ lawyers. Their concerns were disregarded, prompting most to resign.

Instead, the DOJ's office of legal counsel pushed forward with plans to share the public voter rolls, claiming a Privacy Act exception allowed HSI to receive such data without public notice as long as it was for law enforcement purposes. DHS just needed to submit a letter officially requesting the data for those purposes, an attorney in the legal counsel's office explained, according to internal emails.

But this exception was meant to be used to get information on individual criminal suspects, not to gain mass access to data on people suspected of no wrongdoing, according to Nikhel Sus, chief counsel for Citizens for Responsibility and Ethics in Washington, which has sued the Trump administration on behalf of voter and pro-privacy groups, filing the case that eventually limited SAVE's use.

---

**"[Anthony] Salisbury is going to salute and execute, and he is going to make sure that from the HSI side, they fall in line, and there's going to be no resistance or pushback. HSI has been turned into the Swiss Army knife of federal law enforcement."**

— Eric Balliet, a former high-level HSI manager

---

Peter Winn, a 29-year Justice Department veteran who had served as the agency's acting privacy chief for nearly a decade, drafted a letter to set out the data-sharing agreement between the DOJ and DHS, according to internal documents reviewed by ProPublica.

In a Feb. 12 email to two top DOJ officials, he said he'd rewritten an initial draft memo to "make the information sharing arrangement far easier to defend, if and when it is challenged in court."

Rather than simply handing over the voter rolls, Winn proposed having DHS request "pertinent and relevant" information about specific people from the DOJ, then having technical staff at

"Having slept on it," Winn wrote, "I ended up deciding that our initial idea of sending a huge amount of raw unprocessed voter registration data to DHS, involved taking far too much unnecessary legal risk, given that 99% of the data would implicate the privacy and civil liberties of United States Citizens, and would risk adding to the false narrative in the establishment press of DOJ and DHS being unconcerned with the privacy and civil liberties of Americans."

Winn attached his proposed letter, to be signed by Todd Lyons, then the acting director of ICE.

Winn's suggested restrictions were quickly abandoned, however. A second draft of the letter, dated March 4, contained altered language providing that the voter information would be "transferred" to HSI, with one exception: Voters' party affiliation would be redacted, if possible, it said.

The final letter, signed by Lyons and sent to the DOJ just two days later, abandoned even that limitation. Just three paragraphs long, it permitted HSI to use the voter rolls to pursue any "appropriate investigation of potential violations of federal election law."

In response to questions from ProPublica, Winn said "I can't really comment on internal drafts of correspondence."

A Justice Department spokesperson defended the government's actions, saying "no one should oppose intergovernmental data sharing and coordination that enable swift investigations and prosecution of illegal alien voting." DHS echoed the DOJ's view, calling such information sharing "essential to protecting America's election process by keeping noncitizens off voter rolls" and "an easy step to secure our elections."

Sus said that by pooling voters' sensitive personal identifiers, along with their party and voting histories, the administration has "run roughshod" over privacy laws and is creating a "1984-style database" that could be used to surveil political participation.

CREW filed a lawsuit in April on behalf of the nonprofit advocacy group Common Cause that argues it's illegal for the administration to use the law enforcement exception to justify mass sharing of voter information.

Balliet, the former HSI agent, expressed similar concerns, saying that handing over voter rolls to run through DHS' systems amounted to "a mass data-collection effort by the government

PROPUBLICA Donate

"As a citizen, I want the government to take seriously the protection of my private data," he said. "If it falls into the wrong hands, it's not the government that suffers. It's me."



PROPUBLICA Donate




MATT ROTA FOR PROPUBLICA

## Collapsing Claims

By January 2026, scores of HSI agents were fanning out across the country to investigate thousands of leads about illegal voting.

About 25,000 of them involved people SAVE had identified as potential noncitizens on state voter rolls. Another 15,000 were given to HSI's cross-border financial crimes unit, which was told to prioritize them over money laundering and fraud cases, a former high-level HSI official said. Quiñones' unit led a separate effort to find additional cases by reviewing whether people who'd recently become citizens had voted before they were naturalized, then lied about it in naturalization interviews.

Still more leads came from running public voter rolls through the HSI lab's databases, though it's not clear how many. Agency sources told ProPublica that the rolls of New Jersey and Pennsylvania were searched using the Athena Toolbox. When DHS announced it had found more than 250,000 noncitizens on the registered voter lists of four Democrat-led states, it said that included "as many as" 35,152 in New Jersey and 14,576 in Pennsylvania. Both states have asked DHS to provide the source of the numbers.

Once federal investigators started digging into these cases, however, they often fell apart.

Through May, prosecutors had charged fewer than four dozen people with crimes related to noncitizen voting, ProPublica's analysis of DOJ data and federal court filings shows, getting convictions or guilty pleas in 14 cases.

of the president's political opponents. Voters have been sentenced in eight of the office's cases; seven others are pending.

Prosecutors have initiated a total of seven noncitizen voting cases as of May in the four states where DHS claimed to have found more than a quarter million noncitizens on the rolls. Collectively, these states have more than 40 million registered voters.

Overall, the paltry numbers reflect the realities HSI investigators confronted on the ground as they tried to convert leads into cases, a ProPublica review of records obtained by voting-advocacy groups Campaign Legal Center and Democracy Forward shows.

Emails between agents and local election officials in Texas and Ohio indicate much of the federal information on purported noncitizens was inaccurate, the consequence of flawed data matching. When agents demanded voting histories and registration forms, they often discovered people weren't registered in the counties where HSI thought they were. When voters register, they must attest that they are U.S. citizens; agents found some, however, who'd been put on voter rolls in error after disclosing they weren't citizens. Many had never voted.

---

## "Our initial idea of sending a huge amount of raw unprocessed voter registration data to DHS, involved taking far too much unnecessary legal risk, given that 99% of the data would implicate the privacy and civil liberties of United States Citizens."

— Peter Winn, a Justice Department veteran, in an email urging limits on data sharing that were not adopted

---

Most HSI agents, steeped in pursuing complex international crimes, had no experience in pursuing voting fraud. In his email to Nick Davis at the Justice Department, Teirab, the top deputy in Minnesota's U.S. attorney's office, described the chaos that ensued when the state and at least six counties got subpoenas for voters' records. The demands "presented a host of issues," Teirab wrote to Davis. (Davis did not respond to a request for comment.)

follow," Teirab complained. "Instead of getting up to speed and learning, they have demanded many calls and subpoenas, most of which demonstrate a complete lack of understanding of the investigation."

In Stearns County in central Minnesota, HSI agents subpoenaed voting histories on 13 people, county officials told ProPublica. Only six turned out to live there.

Minnesota Secretary of State Steve Simon, a Democrat, said the effort revealed federal investigators' ignorance about "the nuance of elections administration." The rate of purposeful election crime is "microscopic," he said. "The very human errors that can happen are not some sort of plot or scheme to dirty up the voting rolls, but are just everyday human beings making mistakes, not intending at all to violate any law."

As of May, only one illegal voting case has been referred for prosecution in Minnesota. The state has more than 3.8 million registered voters.

Even Republican-led states like Ohio, which has shared its unredacted voter rolls with the DOJ and run them through the SAVE system, have struggled to meet Trump administration demands to deliver cases.

In October, the Ohio secretary of state referred more than 1,000 voters identified as possible noncitizens to the federal government, claiming 167 had voted at least once since 2018. At least nine HSI agents in Cincinnati and Cleveland began to investigate, emails obtained by Campaign Legal Center and shared with ProPublica show.

The agents bombarded local election officials with requests for voting histories and other records, some dating back decades. "Sorry again for piecemealing these to you," one agent wrote to an official in Butler County, outside Cincinnati, after making five separate requests over two weeks. Mohamed Al-Hamdani, a Democratic member of Montgomery County's Board of Elections, which received similar inquiries, said they amounted to "witch hunts" that ate up staff time.

In February, Davis sent an email pressing Ohio's two U.S. attorneys' offices for an "election integrity" update, asking: "How close are we to complaints/indictments, how many subjects, what issues you've run into, how many referrals have been closed and why, how helpful HSI has

PROPUBLICA

Donate

As of May, just two voting cases had been referred for prosecution in Ohio and no one had been charged, federal data shows. The state has nearly 8 million voters.

In the past, it was uncommon for federal prosecutors to pursue charges against noncitizen voters who didn't understand that it was against the law for them to vote. Without evidence of a coordinated effort or plot, it didn't make sense to put resources into such prosecutions, a former DOJ official who oversaw election cases said.

Now, however, U.S. attorneys' offices are taking a different approach, pursuing prosecutions that could result in prison terms or deportation.

In May 2025, federal prosecutors in Florida filed illegal voting charges against a mother and daughter, both Ukrainian citizens, who'd registered after becoming permanent U.S. residents, then voted in the 2024 presidential election. They've pleaded not guilty, with the mother saying in an interview with investigators that she thought having a green card meant she could vote. They and their attorneys didn't respond to requests for comment from ProPublica. The prosecutor handling the case for the Southern District of Florida also didn't respond to questions. The mother and daughter are scheduled to go to trial in September.



PROPUBLICA Donate



MATT ROTA FOR PROPUBLICA

## "Far-Reaching Consequences"

Experts on both elections and national security warn there may be profound longer-term costs to unleashing the federal government's investigative and prosecutorial might to try to prove the president's claims about noncitizen voting.

Current and former HSI agents say critical investigations — including task forces aimed at drug rings, human trafficking and money laundering — have languished as the agency has pivoted to take on noncitizen voting and immigration enforcement.

In February 2026, according to court files and emails reviewed by ProPublica, an HSI agent in Ohio who'd been leading a multistate child sex abuse investigation was abruptly assigned to pursue dozens of leads on suspected noncitizen voters, work that took months. It wasn't until May that he made an arrest in the other case. Prosecutors have filed child exploitation and pornography charges against the man, 38, in connection with acts involving at least five 14-year-old girls.

Cases like this "don't just stop," said Balliet, the 23-year HSI veteran. "When you pull people off them for an extended period of time, those criminal networks will adapt, and people get killed and kidnapped."

Federal data hints at a broader slowdown in what had been HSI's most urgent work. According to an annual government report, the number of wiretaps obtained by DHS — often to investigate

prosecutorial priorities."

"It's never been a better time to be involved in transnational organized crime," said John Tobon, a high-ranking HSI official who retired in early 2025.

# "The very human errors that can happen are not some sort of plot or scheme to dirty up the voting rolls, but are just everyday human beings making mistakes, not intending at all to violate any law."

— Minnesota Secretary of State Steve Simon

In its statement, DHS denied HSI has neglected its core mission, saying the agency has increased its efforts to combat criminal cartels, gangs and drug traffickers in response to multiple Trump executive orders.

Though HSI's voting-related investigations have yielded only a small number of prosecutions, voter advocacy groups worry the Trump administration will use them to justify more extreme interventions.

Its latest tactics include threatening to withhold funds from states it says are refusing to check their voter rolls for noncitizens and saying it will prosecute state election officials who "knowingly" fail to remove noncitizens. Trump has also continued to press Congress to enact the SAVE America Act, which would require people to provide proof of citizenship when registering to vote, a measure advocates have criticized as a barrier to voting. Democrats are preparing for the prospect of federal troops being sent to the polls to intimidate voters.

"Those concerns are playing out in real time, with far-reaching consequences," said Dax Goldstein, a director at the States United Democracy Center, a nonprofit group that works to build confidence in elections. "When federal agencies are misused and weaponized, people lose trust in government itself."

PROPUBLICA

Donate

To count voter fraud case referrals, we analyzed the May 2026 release of the Justice Department's national caseload data. We examined both active and closed criminal referrals made between Jan. 20, 2025, and May 31, 2026. We counted referrals the DOJ listed as election fraud or where the lead charge was one of a set of voting fraud statutes identified in internal memos. We also examined public court documents to identify every prosecution where those statutes were charged. All prosecutions we included involve alleged noncitizen voters.

---

***Update, Oct. 16, 2026****: Voting rights and privacy organizations sued the Trump administration over its collection of millions of Americans' voter records, citing ProPublica reporting about concerns expressed by insiders at the Justice Department and the Department of Homeland Security that the effort would violate voter privacy and incorrectly flag voters as noncitizens.*

Misty Harris contributed research. William Turton and Avi Asher-Schapiro contributed reporting. Pratheek Rebala and Carla Astudillo contributed data reporting.

**Peter Elkind**

**Jen Fifield**


**Doug Bock Clark**


**Ken B. Morales**


**Andy Mannix**

---

**Filed under —** Democracy, Trump Administration

**Republish This Story**

# More in Trump Administration >

<

PROPUBLICA

Donate




Citing ProPublica, Lawmakers Introduce Bill to Help U.S. Citizens Sue ICE for Wrongful Detentions




Trump Appointees Asked a Federal Cybersecurity Agency to Secretly Acquire a Voting Machine — and Hack It

“D
Aga
Vot

# Most Read

1 How Trump’s FBI Purge Saved Lindsey Graham and James Clyburn From a Bribery Investigation

2 Trump Appointees Asked a Federal Cybersecurity Agency to Secretly Acquire a Voting Machine — and Hack It

3 “Biblical Justice, Equal Justice, for All”: How North Carolina’s Chief Justice Transformed His State and America

4 The Militia and the Mole

6 He Tried to Set Limits on His State’s School Vouchers. Billionaires Helped Bankroll a Campaign to Unseat Him.

7 The Dominican Baseball Factory

8 The FBI Anti-Corruption Squad Was Circling Susan Collins — Until Trump Got in the Way

9 Ken Paxton’s Anti-Abortion Influence Already Extended Beyond Texas. He Could Take It Further in the Senate.

PROPUBLICA

Donate

9 Introduce Bill to Help U.S. Citizens Sue ICE for Wrongful Detentions

10 Wedding Was Secretly Bankrolled by Russian Oligarch Close to Putin

# Support Independent Journalism:

As a nonprofit newsroom, we rely on donations from individuals like you to fuel our work. **Your support today will directly fund investigations that shine a light on urgent issues:** corporations prioritizing profits over public safety, health insurers denying coverage to patients, unintended consequences of new laws and more.

Donate

More Ways to Give

## Go behind the scenes of ProPublica's biggest investigations.

Your email address

Get our weekly newsletter

PROPUBLICA

Donate

COVERAGE

LOCAL

CONTACT

SUPPORT US

INFO
About
Impact
Leadership
Staff
Partners
Awards
Events
Jobs
Fellowships

COVERAGE
Abortion
Civil Rights
Courts
Criminal
Justice
Debt
See All

LOCAL
Midwest
Northwest
South
Southwest
Texas
Local
Reporting
Network

CONTACT
General
Inquiries
Send Us a Tip
Corrections
Freelance
Pitches
Media Inquiries

SUPPORT US
Donate
More Ways To
Give

Investigative Journalism in the Public Interest

PROPUBLICA

Code of Ethics Republishing Privacy Policy Advertising Policy Gift Acceptance